UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CENTENNIAL INSURANCE COMPANY** | **CIVIL ACTION** |
| **VERSUS** | **NO: 04-0908** |
| **BUSINESS LOAN CENTER, INC.** | **SECTION: "S" (4)** |

### ORDER AND REASONS

**IT IS HEREBY ORDERED** that Centennial Insurance Company's motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, is **DENIED**. (Document #21.)

### I. BACKGROUND

Centennial Insurance Company (Centennial) filed a complaint for declaratory judgment that Business Loan Center, Inc. (BLC) does not have a viable claim for insurance proceeds in connection with the damage to the F/V LOVELY DADDY II as a result of vandalism because the policy was void. Specifically, Centennial alleges that there is no coverage because the vessel was abandoned by its owner, and the owner did not exercise due diligence in protecting the vessel. Moreover, Centennial contends that BLC's sole interest in the hull and machinery policy is limited by the breach of warranty provision, which does not apply if there is a change in title

or ownership of the vessel.  Centennial filed a motion for summary judgment on its declaratory judgment.

Ven Ly borrowed $670,000 from BLC to finance the construction of the F/V LOVELY DADDY II, and BLC and Ly entered into a preferred ship mortgage on February 16, 2001.[1]  BLC required that Ly insure the vessel, naming BLC as a loss payee, and in addition, that she obtain breach of warranty coverage to protect the mortgagee in the event that a condition or warranty of the policy was breached.

Ly obtained insurance from Centennial for the period of February 19, 2003 through February 19, 2004, with coverage for hull damages up to $700,000 and for personal injury damages up to $250,000.  Centennial exh. F.  The loss under the policy is payable to Ly as the insured and to BLC,[2] and the "Breach of Warranty" provision, for which BLC paid a premium, further protects the interests of BLC.[3]

---

[1]   The vessel was in Ly's name because she is an American citizen, but she had no role in the operation of the vessel.  Centennial's exh. C, 4.

[2]   An "Additional Loss Payee Clause" names American Financial Services, Inc. as an additional loss payee in the event of a total or a constructive total loss of the vessel.  Centennial exh. F (Supplemental Terms and Conditions).  American Financial Services, Inc. is not identified in any of the pleadings.

[3]   The "breach of warranty" endorsement provides:
The interest of BUSINESS LOAN CENTER, not to exceed $670,000, shall not be impaired or invalidated by any failure to comply with any warranty or condition over which the mortgagee has no control, **other than a change in title or ownership of the vessel**.  The foregoing, however, shall in no event be construed to enlarge the nature, scope or number of perils insured against by the policy of insurance to which this endorsement is attached.

In the event of a claim having been made by the mortgagee under the terms of this

Hiep Pham, Ly's brother-in-law, operated the vessel for the first year. Thereafter, Nhut Hoang Le, Ly's husband, assumed the role of captain. During a fishing trip in October 2003, the vessel had problems with the engine, and it was towed to the dock in Leeville, Port Fourchon. Centennial exh. C, 16, 19, 25. After a failed attempt to contact a mechanic, Le locked up the boat and went home. Id., 25-26. Le took the computer monitor, the radar, the Loran-C, and GPS off of the boat so they would not get stolen, but left the computer and a non-functioning depth finder on the vessel. Id., 31, 32. All other fishing equipment, clothing, and personal items were left on the vessel because Ly and Le thought they would go back to the vessel. Id. 33-34; exh. A, 29. Ly and Le did not have the money to make the repairs to the vessel, and Ly called an attorney to discuss filing for bankruptcy protection. Id., 22-23. The attorney advised them not to take anything more off of the vessel. Centennial exh. A, 29.

Ly was unable to make payments due to BLC from July 2003 through October 2003. On October 15, 2003, she filed a voluntary petition under Chapter 7 in the United States Bankruptcy Court for the Western District of Louisiana. BLC exh. A. Ly listed the LOVELY DADDY II on her Schedule of Personal Property. See BLC exh. A. On October 23, 2003, BLC contacted Ly's insurance agent to advise "that the Assured had abandoned the F/V LOVELY DADDY II approximately two weeks prior to that time and had declared bankruptcy approximately one week prior to that time." Centennial exh. D.

---

endorsement, the mortgage on the vessel named herein and the note attached thereto shall be assigned to this insurer upon demand, provided the principal balance due the mortgagee has first been satisfied by the insurer.

Centennial exh. F, Breach of Warranty endorsement (emphasis added).

On November 10, 2003, BLC filed a complaint against the LOVELY DADDY II, *in rem*, in the United States District Court for the Eastern District of Louisiana for breach of contract. BLC exh. B.  The vessel was arrested on November 20, 2003.  BLC exh. C.  On February 19, 2004, the court entered a default judgment in the amount of $653,487.01 and ordered that the vessel be sold to satisfy the judgment.  Id.  The vessel was sold to BLC on May 4, 2004, for $51,000.  Id.

On December 4, 2003, the Lafourche Parish Sheriff received a complaint that a boat had been damaged.  Centennial exh. E.  Philip Latham, a marine surveyor, was at the scene and told the deputies that some "Vietnamese guys" had taken the boat to Port Fourchon and called their loan company to tell them that they could no longer afford the payments.  Id.  Latham did not request an investigation, but he needed a police report in order to file an insurance claim.  He told officers that he estimated that there was approximately $20,000 worth of damage to the vessel's equipment because there was soap powder in the engine and some wiring had been cut. Id.

BLC contacted Ly's insurance agent to make a claim for the damage to the engines and for lost items caused by the vandalism as a "loss payee" or under the breach-of-warranty provision.  Centennial exh. D.  The underwriter, William Trufant, advised that only the assured could make a claim for such a loss and that BLC's rights as a loss payee were no greater than the rights of the insured, and because the policy was considered void as of the time the owner abandoned the vessel, neither Ly nor BLC was entitled to insurance proceeds.  Id.  BLC advised that it would proceed with a claim.  Id.

## II. DISCUSSION

### A. Legal standard

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 809 (5th Cir. 1991); Fed. R. Civ. P. 56(c). If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986). The nonmovant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

The interpretation of an insurance contract and its exclusions is a question of law. See Jarvis Christian Coll. V. Nat'l Union Fire Ins. Co. Of Pittsburgh, Pa., 197 F.3d 742,746 (5th Cir. 2000). Under Louisiana law, the general rules of contract interpretation apply to determine the common intent of the parties to the contract. See Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 630 So. 2d 759, 763 (La. 1994). The intent of the parties as reflected in the policy determines the extent of the coverage. Id. The words of an insurance policy are given their "general, ordinary, plain, and proper meaning . . . unless [they] have acquired a technical

5

meaning." Id.

**B.  Is there coverage available to Ly under the policy?**

Centennial presents two arguments to support its claim for declaratory judgment that it has no liability to Ly under the hull policy for damages incurred on or about December 4, 2003. Centennial contends that 1) the hull policy was void in December 2003 because Ly had abandoned the vessel, 2) the damage was caused by lack of due diligence in safeguarding the vessel and its equipment.[4]

  **1. Change of management or ownership**

Centennial contends that the uncontested, sworn testimony of Ly and Le demonstrates that, after the vessel was tied to the dock in Leesville, Ly divested herself of ownership because Le walked off the vessel, and Ly assumed that BLC would handle all further affairs.  Centennial argues that it received no notice of the change of management or ownership; therefore, the change rendered the policy void, and any subsequent action involving the vessel was not covered by the voided policy.  Centennial relies on the following language in the hull policy:

> This insurance shall be void in case of this policy or vessel named herein, shall be <u>sold, assigned, transferred, or pledged, or if there be any change of management or charter of the vessel</u>, without the previous consent in writing of this Company.

Centennial exh. F, Taylor Form SP-39C, lines 149-51 (emphasis added).  BLC contends that Centennial has not presented evidence to support its contention that there was a change of

---

    [4] In the complaint, Centennial alleges additionally that the damage was caused by Ly's lack of due diligence to keep the vessel seaworthy as required by the warranty of seaworthiness provision.  Centennial does not develop this argument in its memoranda in support of the motion for summary judgment.

management or ownership.

In her sworn statement, Ly recounted that the vessel's engines stopped working while her husband was offshore fishing. He contacted Pham by radio, and Pham responded and towed the vessel to the dock. Centennial exh. A, 20. According to Ly, her husband removed some equipment from the vessel, which was their usual procedure to guard against theft while the boat was at the dock. Id., 23. Following their attorney's instructions, Ly and Le padlocked the doors and tied the boat before returning to their home. Id., 25.

Then counsel began to question Ly about abandonment as follows:

**Q.** [W]hen did you feel like the boat was **abandoned**? When you said, "Okay, I can't–I'm not going to be able to pay for this, and I'm going to file for bankruptcy, and Bank, you can have the boat," or whatever. When did that happen?

**A.** Like a couple months back because like we just coming–the shrimp selling just like Fifteen Thousand–Thirteen Thousand like that. And like I borrowed my mom's money to pay for the notes. And like we can't handle that, you know. That's why like–and the boat–the engine is like–it's not work well. Like he'll be real like–the boat was not working and like we just called out Caterpillar come and check–check every time like that when they coming. And every time they go out there it's not like for a month, you know, just like a week–ten days. And the engine is not work good, and he have to fix that almost five days something like that, is on that.

**Q.** All right. So is it fair to say that the last day that you felt like you **abandoned** the boat, the day you left it after the police had called you out; is that correct?

**A.** Hm-hmm (affirmatively).

**Q.** So that would have been two days or so after the last trip.

**A.** Yes.

**Q.** Is that when you **abandoned** the boat?

**A.** Yeah.

**Q.** Okay. And you'll get me those shrimp tickets so I know when that day is, all right? And then you want to go see your lawyer Mr. Ike. And he–because of the fact that you were in financial trouble and you needed to file the bankruptcy; is that correct?

**A.** Yeah.

**Q.** And you had not been to the boat since; is that correct?

**A.** Yeah.

. . . .

**Q.** All right. The attorney for the bank that–when he called you and talked to you, what kind of questions was he asking you?

**A.** He ask me like did the boat was damage and stuff, and I took something from the boat. But I say, "No, unh-unh." Like even the clothes and everything, we left there because like, I thought like we still going and work, you know, so we don't take anything. And when I go back to talk to the lawyer and the lawyer say like you cannot get anything on the boat. So like I still have a lot of thing on the boat I didn't take out yet.

Id., 26-29 (emphasis added).

Le made the following sworn statements to Centennial's counsel:

**Q.** And as far as you are concerned, you turned the boat over to the bank on whatever day it was that you arrived at the dock in October, and y'all called the attorney and said, "We have to file for bankruptcy"?

**A.** Yes. After leaving the boat, I contact the attorney to get his advice, and he told us to lock the boat and go home–and to go home. . . . [T]he attorney contacted the bank and was told that the bank would be foreclosing on the boat–no; foreclosing on the–would be taking the boat back.

. . . .

**Q.** So as far as you're concerned, when you walked away from the boat upon

8

   instructions from your lawyer, the bank was going to take over the management
   and handling of that boat; is that correct?

 **A.** Yes.

Centennial exh. C, 36-37.

  The court finds that Centennial's evidence that the vessel was docked and BLC notified that they could no longer pay the mortgage does not establish that there was a change of ownership or management. Ly and Le were not represented by counsel when Centennial's lawyers took their sworn statements, and it is clear from the transcript that they had difficulty with the English language. Further, Centennial's lawyers did not explain to them that there was any legal meaning to the term "abandonment" or that the use of the term implied that they had changed ownership or management. Their testimony indicates that they exercised care in securing the vessel and any equipment that could be stolen. Ly and Le left personal items, such as clothes, aboard the vessel and did not return to retrieve the items because of their counsel's advice. Ly intended to file bankruptcy and knew that the vessel would no longer be hers. Ly's listing of the vessel in her schedule of property is evidence that she did not intend to relinquish her right of ownership prior to the legal process she would pursue. BLC filed a complaint *in rem*, and the vessel was arrested shortly thereafter on November 20, 2003. Accordingly, the court concludes that Centennial has not met its initial burden of establishing that there was a change in ownership or management through abandonment when Ly left the vessel at the dock in Leeville.

### 2. On board warranty

Centennial contends that Ly breached her duty to act with due diligence to protect the vessel from vandals by abandoning it. In support of its claim of the breach, Centennial relies on the "On Board Warranty" endorsement in the policy, which provides:

> ON BOARD WARRANTY: It is warranted that **Nhut Le or Hiep Pham or relief Capt.** will be on board the vessel named herein at all times when not safely berthed and in port.

Centennial exh. F, Form DEF-0033.

Centennial argues that, if the vessel had been manned and periodically moved, the vandalism would not have occurred. As discussed above, Centennial has not established that Ly abandoned the vessel. Further, Centennial makes no showing that the vessel was not "safely berthed and in port" as required by the "On Board Warranty." Accordingly, Centennial is not entitled to judgment as a matter of law.

### C. Breach of warranty endorsement as to BLC

Centennial contends that BLC is not entitled to recovery under the breach of warranty endorsement. Centennial argues that the "breach of warranty" endorsement is not applicable if there has been a change in title or ownership of the vessel. See Centennial exh. F, Breach of Warranty endorsement. As discussed above, Centennial has not established that there has been a change in title or ownership, and summary judgment is not proper.

New Orleans, Louisiana, this __7th__ day of December, 2005.

_____
MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE